THE PRESS COMPANY, LIMITED, v. S. N. STEWART.

ERROR TO THE COURT OF COMMON PLEAS NO. 1 OF PHILA-
DELPHIA COUNTY.

Argued January 17, 1887—Re-argued March 26, 1888—Decided April 9, 1888.

1. In a civil action for a libel, when the alleged libelous publication purported to be an account of an interview with the plaintiff and justification was pleaded, it was error to refuse to instruct the jury that if they believed that the article was a fair and true account of an interview had, the verdict must be for the defendant.

Statement of Facts.

2. A communication, to be privileged, must be made upon a proper occasion, from a proper motive, and based upon reasonable or probable cause; when so made in good faith, the law does not imply malice from the communication itself, as in the ordinary case of libel, but actual malice must be proved, and, whether the communication be privileged or not, is a question for the court, not the jury: Briggs v. Garrett, 111 Pa. 404.

3. A plaintiff who holds himself out as a teacher and guide of youth, and seeks to attract them to his place by signs, placards and advertisements of an extraordinary nature, assumes a quasi public character; and, whether or not he is a proper person to instruct the young and his school a proper place therefor, are matters of importance for the information of the public.

4. Wherefore, in such a cause, it is the duty of the court to instruct the jury that an article, in which such information is given to the public, is in such sense privileged that no presumption of malice arises from the mere fact of publication, and that malice in fact must be proved before the plaintiff can recover.

Before GORDON, C. J., PAXSON, STERRETT, GREEN, CLARK and WILLIAMS, JJ.; TRUNKEY, J., absent.

No. 415 January Term 1887, Sup. Ct.; court below, No. 736 June Term 1883, C. P. No. 1.

On July 31, 1883, Sylvester N. Stewart brought an action in case against The Press Company, Limited, to recover damages for the publication of an alleged libel.

The declaration averred that the occupation and business of the plaintiff at the time of the publication was that of a teacher of the arts of short-hand writing, type-writing and phonoscribing; that he had pursued said business with credit and reputation, and had opened a school for the purpose thereof in a building on the corner of Thirteenth and Market streets, and had put up in a conspicuous place outside said building a sign as follows: " School of Clerks, Secretaries and Reporters; " had then and there obtained divers pupils, and he had always conducted himself in his said business with skill, etc., etc.; charging that the defendant without the knowledge of plaintiff had caused a reporter engaged on a newspaper called *The Press*, published by the defendant company, to visit the plaintiff on July 12, 1883, and that the defendant on July 13, 1883, had caused to be published in said newspaper of and concerning the plaintiff the following libelous publication:

## A SCHOOL FOR REPORTERS.

How Col. Stewart Proposes to Manufacture City Editors.

On the northeast corner of Thirteenth and Market streets, there is a building. On the third story of the building there is located the office of the "School of Clerks, Salesmen and Reporters."

A green and innocent PRESS reporter with a bucketful of trade dollars (in his mind's eye) climbed up three flights of stairs yesterday afternoon to have a talk with the proprietor of the "school." Colonel Stewart, the principal, was seated in a 6x8 anteroom, north of the "school." He was not particularly enthusiastic over the prospect of the "school's" prosperity, or the visitor's chances of becoming a bloated millionaire.

" Are you a short-hand writer? " was the first question he asked.

" No, sir," replied the visitor.

" Do you wish to become a salesman? "

" No, sir."

" Are you after a position as amanuensis in a mercantile house ? "

" No—I would like to be a reporter."

" Well," said Col. Stewart, as he tugged at his beard, " the school is intended as a place where persons can learn short-hand, type-writing and phono-scribing."

" But," ventured the visitor, " cannot a man become a reporter without understanding short-hand? Is that a requisite?"

" For sermons and speeches it is," was the reply. " The class of reporters you refer to are known as city editors; they are all gentlemen of high education, and are generally graduates of colleges. Newspapers are besieged constantly by applicants for such positions. These men are not reporters; they are city editors; there are about three dozen of them in the city."

" Oh! " said the reporter.

" Yes," continued Colonel Stewart, " it requires a vast amount of experience to become a city editor—you must be well educated, and have a general knowledge of—"

" Suppose," interrupted the green reporter, " that a reporter is sent to a fire in a large pretzel establishment, must he—"

" Certainly," responded Colonel Stewart, " of course he must. It requires men of classical education. We do not pretend to instruct applicants for such positions. The school teaches short-hand and type-writing and phono-scribing, but a change is to be made here shortly. I would advise you to consult with Mr. Kerr, who will take charge in a few days. Mr. Kerr has an office on Walnut street. He is twenty-four years of age. He will tell—"

" Ta-ta," said the applicant.

" So-long," responded Colonel Stewart. " If you want to learn any of the branches—$20 a quarter—good-by ! "

The cause came on for trial under the plea of not guilty on November 10, 1885, when the following special pleas were filed by leave of court :

1. The defendant, for a further plea in this behalf, comes and says : That the plaintiff ought not to further have or maintain his aforesaid action thereof against it, because it says that it is true as stated in the article complained of in the plaintiff's declaration, that in the third story of a building on the N. E. corner of Thirteenth and Market streets there was located the office of the "School of Clerks, Salesmen and Reporters:" that Colonel Stewart was the principal of the school, and that he was not particularly enthusiastic over the prospects of the school's prosperity, and this the defendant is ready to verify; wherefore it prays judgment whether the said plaintiff ought to further have or maintain his aforesaid action against it.

2. And for a further plea in this behalf, the defendant comes and says : That the plaintiff ought not to further have or maintain his aforesaid action thereof against it, because it says that it is true, as stated in the article complained of in the plaintiff's declaration, that Colonel Stewart, the principal of said "School of Clerks, Salesmen and Reporters," had an interview with Vincent S. Cooke, wherein the following conversation occurred : [here follows the conversation reported in substantially the same form as in the alleged libelous publication, a few of the embellishments being omitted.] And this the defendant is ready to verify; wherefore it prays judgment whether the said plaintiff ought to further have or maintain his aforesaid action against it.

3. The defendant by leave of court first had and obtained, for a further plea in this behalf comes and says, that the plaintiff ought not to further have or maintain his aforesaid action against it, because it says that the said article contained in the plaintiff's declaration, is a just and true account of an interview had between the said plaintiff, Sylvester N. Stewart, and Vincent S. Cooke, who was a reporter upon *The Press*, a newspaper published by the defendant, and this the defendant is ready to verify; wherefore it prays judgment whether the said plaintiff ought to further have or maintain his aforesaid action against it.

To the first special plea the plaintiff demurred, as insufficient in law, and assigned as ground that it proposed a false and frivolous issue and averred facts which if found by the jury to be true would not establish a defence. To the other special pleas the plaintiff replied their untruth in point of fact.

In the testimony taken, requiring three hundred printed pages to contain it, not including the exhibits of circulars, letters, etc., in evidence, it appeared that in 1883 the plaintiff was conducting a school at the place designated in the declaration, advertised extensively by conspicuous signs upon the building and by circulars distributed by mail and otherwise, worded in such a way as to attract attention, and describing the school as, " The National School of Clerks, Salesmen and Reporters. Teach Phono-scribing, Brief Long-Hand, Writing Machines and Phono-scribing. Our Schools Teach All that Can be Taught in Other Short-Hand Schools, and Phono-scribing in Addition, which No Other Schools are Permitted to Teach." About the time the article appeared in the defendant's newspaper, the plaintiff sold out his business to G. H. Kerr and J. W. R. Collins, reserving a royalty for each pupil under the new management. The school was kept open by the vendees until the fall afterwards. During the trial many exceptions were taken to the admission or rejection of offers of testimony, not material for consideration as the case was decided. There was no evidence showing actual malice on the part of the defendant.

The court, PEIRCE, J., charged the jury and answered the defendant's points as follows:

This is an action brought by Mr. S. N. Stewart against The Press Company, Limited, for an alleged libel which he says they published July 13, 1883, respecting him and his school.

[Any malicious printed slander which tends to expose a man to ridicule, contempt, hatred or degradation of character is a libel. Mr. Stewart alleges that this publication is of that character, and not only affects him in his good name and reputation and character, but also affected his business, and the profits and income which he claims he was entitled to receive by reason of his royalty in the business which he sold to the purchasers. Malice, gentlemen, is said to be malus animus, that is, a bad mind. It may not be a bad mind directed against a particular individual; if it were, and if the object were revenge, injury and wrong to a particular individual it would be special malice; but a man may have the malus animus, the bad mind existing, and exercising it in a general way, and then it is sometimes referred to as general malice.][1]  As, for instance, if a man should fire promiscuously into a crowd, not knowing a solitary individual, he has the bad mind, he has malice, and wantonly inflicts injury without even knowledge of the particular persons against whom the malice is exhibited.

[Now the question that is submitted to you is whether this article is a malicious publication, tending to expose the plaintiff to injury, contempt, hatred, or degradation of character, or tending to injury and hurt of his business. In determining that question you will look at it carefully; you will take the article, and read it for yourselves. The principal complaint made against it is, that it holds him up to scorn and contempt; that it ridicules him. It speaks lightly and indifferently, to use a very mild term, of his school.][2]  When I say, to use a mild term, I do not mean to designate, even by implication, the character in which reference is made to the school, but that is the allegation which is made respecting this particular libel.

[Now, a part of the defence, here, rests upon the fact that this was a publication by a public newspaper in the interest of society and of the people, and that therefore it is not to be regarded as wanton and malicious, for the end and purpose of it was to protect society against a wrong, and that the article was a fair criticism of what the reporter learned respecting

Mr. Stewart and his school. It has been well said in respect to the liberty of the press that it should at all times be justly guarded and protected; but so should the reputation of an individual against calumny—the right of each is too valuable to be encroached on by the other.

The law, gentlemen, is the humane protector of us all. The man of power needs the protection of the law, and the weak ; we all need its protection, and the law is so universal, like the air which encircles us, which we breathe, that its beneficent control and care and supervision is about us all. It should be the high ambition of those who are strong and powerful not to encroach upon the weak, but to do that which the law does, throw around the weak their protecting care. Therefore the law does not encourage any wanton assault of any one, great or small, strong or weak; least of all, will it encourage an assault by the strong upon those who are weak.

But all men are equal before the law which makes no distinction in its protecting care, and you, gentlemen, are just as absolutely bound in this case to protect the rights of the defendant here, as you are the rights of the plaintiff. Some allusion has been made, and some terms have been used here, in reference to Mr. Stewart's peculiarities. He has been referred to as a crank. The law protects cranks and punishes them, too ; for if a man who is a crank commits a crime, the law visits him with the effect of his crime, even to public execution and death, unless his mind is so perverted that it was impossible for him to know what the crime was that he had committed. And so the law jealously and carefully throws around him its protecting arms, so that neither private persons, associations, individual writers, or writers for the press, have any more right to assault a man who has his peculiarities and is brought within what is referred to as "a crank," than it has to assault the highest and best citizen.] [3] These are general remarks. I do not apply this term to anybody, and I only refer to it because it has been adverted to here, and some evidence has been given respecting the particularities and peculiarities of Mr. Stewart.

[You have heard the evidence. A part of the evidence refers to attempts said to have been made by Mr. Stewart to influence and induce certain witnesses who were examined

here to commit perjury. If you are satisfied from the evidence that he did endeavor to induce these persons to commit perjury in this case, then of course, gentlemen, it must affect and ought to affect your estimate of his testimony, so far as it refers to any doubtful matter.] [4]

His answer to that is—and a witness has been submitted to you here for the purpose of showing that the principal conversations in which it is alleged that he endeavored to persuade these parties to commit perjury—that the object was not for that purpose, but to induce them to tell the truth respecting the extent of his interests in the alleged royalty. You have heard all that testimony. It is for you to pass upon it. You have heard the charge made against him and you have heard the explanation of it.

[Relative to the measure of damages in such a case as this, if the plaintiff has been libeled, your verdict should determine that question in his favor. Then you will take into consideration not only the injury, if any, that was done to his business, and to what extent that was affected, but you will also take into consideration the personal wrong done to him, the vexation, harassing and annoying to his personal feelings, if he was so affected by this libel.

Relative to the injury done to his business, there is no allegation that he did not get the full value of the sale that he made to Messrs. Kerr and Collins. That was sold just as it was agreed to them before the publication of this article; but his allegation is that it affected the public mind as against his system, and his opportunity and right to teach it, and also affected the possible or probable income from a royalty which he had sold to Messrs. Kerr and Collins; and if you find those facts to be so, these are proper considerations for you in estimating the damage.] [5]

We all know the value of the public press; we all know, rightly conducted, it is our protector, and the protector and preserver of our institutions; we also know that it is an instrument of great power, and wisely and well wielded cannot be too highly commended; [but we also know that by reason of its power, of its influence, and the extent of its power, its far-reaching power, it is going where private individuals cannot .go, meeting thousands where the individual can meet but few.

Charge of Court below.

So also is its responsibility great, and it is your duty to protect the press in all its rights, just as it is your duty to protect the individual in his rights of self-respect, of self-preservation, of guardianship and protection from calumny and wrong and slander and malice.][6] The duty is equal. Both are entitled to protection at your hands, and the law gives them equal protection, and I am sure, gentlemen, after the patience and attention which you have given to this cause, and after the able arguments of counsel on both sides, you will not be disposed to disregard the right of either. I do not know that it is necessary for me to say anything more, except to pass upon certain points which have been submitted to me by counsel for the defendant:

The following are the points presented by the defendant and the answers thereto:

1. Want of proof on the part of the defendant that the supposed libel was true, is not enough to prove malice; and before the plaintiff can ask the jury to find that the publication was malicious, they must first show that the charge was false and that the defendant knew at the time of publication that it was false, or that the defendant was actuated by mischievous or malicious motives.

Answer: The first point I decline.[7]

2. Although falsehood may be evidence of malice, the mere falsity of a publication, without its being shown that the defendant knew it to be false, is not of itself evidence of malice.

Answer: The second I decline.[8]

3. If the jury believe that the defendant published the alleged libel, not for the purpose of gratifying personal malice against the plaintiff and to do him mischief and injury, but from an honest and fair purpose for public information, your verdict should be for the defendant.

Answer: I affirm that point, with this qualification: when the information is such as the public have an interest in knowing, it then amounts to a privileged communication.[9]

4. If the jury believe that the matters complained of in the said alleged libel were true or substantially true, they are bound to find, in the absence of any evidence showing malice on the part of the defendant, a verdict for the defendant.

Answer: The fourth I decline.[10]

5. Inasmuch as a pecuniary loss is the gist of the action for libel, if the language contained in the alleged libel has not occasioned the plaintiff any pecuniary loss, actual or implied, no action can be maintained and your verdict should be for the defendant.

Answer: The fifth I decline.[11]

6. The onus of proving malice lies on the plaintiff; the defendant cannot be called upon to prove that he did not act maliciously, until some evidence of malice, more than a scintilla, has been adduced by the plaintiff.

Answer: I affirm that, with this qualification: but malice may be inferred from the publication itself.[12]

7. Even if the words contained in the libel are proved or admitted to be false, it is no evidence of malice unless evidence be also given by the plaintiff, to show that the defendant knew they were false at the time of publication.

Answer: The seventh I decline.[13]

8. The requisites of a libel are three; the language complained of must be defamatory, false and maliciously made. When the necessary consequences of the language must be pecuniary loss, then it is defamatory, per se; but, if the language is such as may result in pecuniary loss, then it is not defamatory per se, and in such a case the law will not infer malice. But it must be proved as a fact by the plaintiff that the defendant, in making the publication, was actuated by malice, and in addition that he has suffered pecuniary loss, which was the necessary result of the publication.

Answer: The eighth I decline.[14]

9. Where language is alleged to be concerning the person and also concerning the affairs of that person, then the allegation of falsity is material, and the plaintiff must show that the language complained of is false, that it was maliciously published and that the publication as a necessary consequence occasioned pecuniary loss to him.

Answer: The ninth I decline.[15]

10. The language complained of in this case is of the plaintiff in his business or trade, and in such a case it is not sufficient that this language disparages him generally, or that his general reputation may be thereby affected. It must be such as would disqualify him or render him unfit properly to fulfil the

duties incident to his special business, and before language published of one in his trade or business can be considered actionable per se, it must impute to him fraud, want of integrity, misconduct in the line of his business, or such ignorance or other incapacity as unfits him for its proper exercise.

Answer: The tenth I decline.[16]

11. If the jury believe that the plaintiff requested either Mr. Kerr or Mr. Collins to swear upon the trial in this case to any facts or fact which were not true, then he is entirely unworthy of belief and the jury should disregard his testimony.

Answer: I affirm that with this qualification: which were untrue and which he knew were not true; it is not enough for the thing to be untrue, but in order to make the crime perjury or false swearing, it must be wanton and wilful.[17]

12. If the jury believe that the publication complained of is a fair and true account of an interview had between the plaintiff and Mr. Cooke, your verdict must be for the defendant.

Answer: The twelfth I decline.[18]

13. The plaintiff in this case having advertised a public school, inviting the public to patronize it, the school thereby became a matter of public interest, and if *The Press* honestly and with fair intention of exercising its vocation, fairly and with reasonable moderation and judgment published the article complained of, your verdict should be for the defendant, even if the writer fell into slight errors as to facts and went beyond the limits of strict truth. There is no limit to such comments, except malice in fact.

Answer: I affirm that, simply re-uttering the statement that it is not necessary that express malice should be proved. Malice may be inferred from the publication itself.[19]

15. If this publication was a matter in which the public was concerned and was proper for public information, the occasion prevents the inference of malice, and if there was no actual malice the publication is protected, and this protection is not restricted within narrow limits.

Answer: I affirm this, with the former qualification that it is not necessary it should be express malice. Malice may be inferred from the publication itself.[20]

The jury returned a verdict in favor of the plaintiff for
$1,200. A motion for a new trial was entertained, which
motion on January 16, 1886, was overruled by the court in
banc, BIDDLE, J., filing an opinion, which in part was as fol-
fows:

The rule of law as laid down in the text books will be found
in Townsend on Slander, §§ 399 and 244 b. where all the au-
thorities, English and American, are collected. In § 399, he
says: " The language itself, whether oral or written, may be
evidence of malice, and when the occasion renders the publi-
cation prima facie privileged the jury may take the language
into consideration, to determine the intent with which the
publication was made. Any expression in excess of what the
occasion warrants may be evidence of malice." And again, in
§ 244 b.: " Expressions in excess of what the occasion war-
rants do not per se take away the privilege, but such excess
may be evidence of malice." Our own decisions, see Pittock
v. O'Niell, 63 Pa. 253, are in entire accord with this view of
the subject. The Supreme Court of Massachusetts, in Miller
v. Butler, 6 Cush. 71, held " that in judging of the malicious
character of an alleged libel the jury may take into considera-
tion the whole publication; and if it contains statements con-
cerning other persons which are malicious, the jury may infer
therefrom that what is said of the plaintiff is also malicious."
These familiar principles have been reiterated in the case of
Neeb v. Hope, 111 Pa. 145, recently decided by our Supreme
Court and just reported. Says Mr. Justice TRUNKEY: " It is
a matter of law for the court to determine whether the occa-
sion of writing or speaking criminatory language, which would
otherwise be actionable, repels the inference of malice, consti-
tuting what is called a privileged communication; and if there
is no intrinsic or extrinsic evidence of malice, it is the duty of
the court to direct a nonsuit or verdict for defendant. If the
communication contains expressions which exceed the limits
of privilege, such expressions are evidence of malice, and the
case shall be given to the jury."

The present case belongs to that class where the character
of the publication must be the main evidence to determine the
intent. The plaintiff's complaint was that the article was in-
tended to hold him up to public ridicule, and was in no sense

intended to be an honest or fair notice of his school.   In a case of that sort the truth of the accusation is best determined by reading the article.   As in the case of an alleged caricature, the exhibition of the picture best determines the intent, and it is for the jury to say, after inspection, whether it is want of skill simply or design that makes it ridiculous.   And there is no better test.   The question is how the publication would strike the ordinary observer.   So in this case, the publication was not of a serious character, and the judge, expressing no opinion on it, left it for the jury to say what inference should properly be drawn from it; whether it was intended to expose the citizen to ridicule, or to criticise fairly his school.

Assuming the law to be as we have stated it, were the instructions of the judge in accordance with it?

We have in Pennsylvania a statute which requires a judge to answer, on the spur of the moment, any points of law submitted to him before the close of the argument to the jury. They are sometimes presented to procure accuracy of ruling; more often, perhaps, to procure inaccuracy, for subsequent use on a motion for a new trial.   These points are drawn with great adroitness before the trial, and a lawyer has very hard luck if, out of fifteen or twenty of them, he cannot get some expression in one, which subsequent investigation may enable him to make use of.   In considering them they must in fairness be considered together and as a part of the charge, and if in that connection they are believed not to have misled the jury, but to have substantially given proper instructions, the verdict is maintained.

The 6th point was in these words: " The onus of malice lies on the plaintiff; the defendant cannot be called to prove that he did not act maliciously until some evidence of malice, more that a scintilla, has been adduced by the plaintiff."   To this the judge replied: "I affirm this, with the qualification, that malice may be inferred from the publication itself."   This is said to be inaccurate, and it is contended that the judge should have said "not from the publication itself," but "from the contents of the publication itself;" that it might have been inferred by the jury that the judge meant that they could infer malice from the mere fact of publication without regard to the contents of it.   Perhaps if the judge had been discuss-

ing the law of libel with a lawyer, he might have so said, as the distinction undoubtedly can be taken. It must, however, be remembered, that while these points are drawn by lawyers, the answer is not addressed to them, but to the jury, and the question is whether they would ever think of such a distinction. If a person should say that he inferred from the publications of Mr. Thackeray that he designed to hold up to ridicule many classes of persons, it would surely never enter the mind of any one to suppose that he inferred it from the fact of his having published books, without reference to their contents.

The 14th point was read twice and affirmed, once without the word "outrageous," subsequently with it, and, at the request of a juror, read a third time and affirmed. It was in these words : "If you find that the subject matter of this article was a matter in which the public was concerned, then the communication was privileged, and your verdict should be for the defendant unless that you find that the report was so unreasonable and outrageous that no person could honestly have made it upon the materials before him, and was the result of actual malice."

This, in his own words, gave to the jury the very fullest instruction on this point that the defendant had any possible right to ask for.

It is further contended by the defendant, " But even if the publication amounted to a libel, if it were a correct report of the words and language used by the plaintiff, the verdict should not stand."

We do not think, however, that in all cases "a correct report of the words and language used by the plaintiff" absolves the defendant from liability. A publication may very accurately state the words and language used by the plaintiff, and yet by punctuation, marks of exclamation, marks of admiration or quotation marks, throw them into ridicule. A ridiculous heading, interjection of slang words or phrases and ideas suggested as passing through the mind of the reporter, would have the same effect. And it is complained in this case that wherever the plaintiff is spoken of as the proprietor of " a school," it is always between inverted commas, intended to convey the idea that the designation is misapplied and

absurd. The question is not alone, therefore, whether the language used by the plaintiff is accurately reported, but whether the interview has not been discolored and garbled by the comments incorporated in it, in a way to make the plaintiff ridiculous. This we think should properly be left to the jury to decide.

Judgment having been entered upon the verdict the plaintiff took this writ assigning as error, inter alia:

1-6. The parts of the charge embraced in [ ] [1 to 6]

7-20. The answers to the defendant's points. [7 to 20]

*Mr. James H. Shakespeare* and *Mr. James H. Heverin*, for the plaintiff in error:

1. That the communication was privileged does not admit of doubt. When the plaintiff proclaimed himself a teacher and sought to draw public attention to his school and to a system of education which possessed superior advantages and phenomenal merits over all other avocations in life, by public advertisements, glowing placards, conspicuous signs and attractive devices, he threw out, in the language of this court in Briggs v. Garrett, 111 Pa. 404, "a challenge to the entire body of citizens of Philadelphia county, to canvass his qualifications and fitness for that position." Every man has a right to discuss fully, so long as he does it honestly and without malice, any subject in which the public are interested, and to state his own views and advance those of others for the consideration of all or any of those who have a common interest in the subject; and, while he does so, he has a privilege, attaching to such a right of free discussion, of the same character, which has been held to attach in numerous instances in which the liberty of speech has been allowed upon grounds of social convenience where the writer and the person addressed have a duty or interest in common, the existence of which is held to rebut the inference of malice: Henwood v. Harrison, L. R. 7 C. P. 606.

2. Privilege is the protection which the law throws over a citizen who makes a defamatory publication, where his interests or those of another, or of society itself, require that he should speak: McIntyre v. McBean, Up. C. 13 Q. B. 534; Decker v.

Gaylord, 35 Hun 584; Hart v. Gumpach, L. R. 4 P. C. 439; Kelly v. Sherlock, L. R. 1 Q. B. 689; Kelly v. Tengling, L. R. 1 Q. B. 699; Purcell v. Lawler, L. R. 1 C. P. 781; Palmer v. Concord, 48 N. H. 211; Cooly on Torts, 217; Waller v. Locke, 45 L. T., N. S., 243; Thompson v. Dashwood, L. R. 11 Q. B. 43.

3. When the occasion is privileged, the burden of proving actual malice is upon the plaintiff, and its existence must be fully made out, the presumption being that it does not exist: Spill v. Maule, L. R. 4 Exch. 232; Decker v. Gaylord, 35 Hun 584; Lewis v. Herrick, 16 N. Y. 372; Bank v. Henty, L. R. 7 App. C. 741; Howe v. Jones, 79 L. T. 81; Laughton v. The Bishop, L. R. 4. P. C. 504; Toogood v. Spyring, 1 Crom. M. & R. 192; Woodgate v. Ridout, 4 F. & F. 217; Hunter v. Sharpe, 4 F. & F. 983; Clark v. Molyneaux, L. R. 3 Q. B. 237; Delany v. Jones, 4 Esp. 191; Bradley v. Heath, 12 Pick. 163.

4. The presumption of good faith and want of malice, when the communication is privileged, is not rebutted by proof that the statements are untrue; the plaintiff must show that the defendant knew or had good reason to believe they were untrue: Hastings v. Luck, 22 Wend. 410; Spill v. Maule, L. R. 4 Exch. 495; Ormsby v. Douglas, 37 N. Y. 477; Remington v. Congdon, 2 Pick. 311; Van Wyck v. Aspinwall, 17 N. Y. 193; Thorn v. Blanchard, 5 Johns. 508; Liddell v. Hodges, 2 Bosw. 541. The Pennsylvania cases are in full accord with the foregoing and lay down precisely the same doctrine: Gray v. Pentland, 4 S. & R. 420; Flitcraft v. Jenks, 3 Wh. 158; Chapman v. Calder, 14 Pa. 365; Pittock v. O'Niell, 63 Pa. 253; Neeb v. Hope, 111 Pa. 145; Briggs v. Garrett, 111 Pa. 404.

5. It is matter of law for the court to determine whether the occasion of writing or speaking criminatory language, otherwise actionable, repels the inference of malice, constituting what is called a privileged communication: Henwood v. Harrison, L. R. 7 C. P. 606; Neeb v. Hope, 111 Pa. 145; Briggs v. Garrett, 111 Pa. 404; Hart v. Gumpach, L. R. 4 P. C. 439. It was therefore error not to explain to the jury that the burden of proving express malice was upon the plaintiff; the nature and character of the evidence necessary to prove

express malice; the relation and position of the parties; that the action would not lie if the statements were made honestly and in a belief of their truth and that the burden was on the plaintiff to prove that they were not so made; that if there were probable cause for the publication, the action could not be sustained and that if there were not probable cause the plaintiff could not recover in the absence of proof of actual malice. If the jury were misled as to the law, or if the tendency of the charge was to mislead them, it was error and a ground for reversal: Rice v. Olin, 79 Pa. 397; Penn. R. Co. v. Berry, 68 Pa. 279; Bisbing v. Bank, 93 Pa. 80; Shimer v. Jones, 47 Pa. 276.

6. The refusal to affirm the defendant's twelfth point involved a plain denial of the right of a public journal to prove the truth of a privileged communication. The right to justify in civil actions for libel and slander is a universally established doctrine of the law: Runkle v. Meyer, 3 Y. 518; Pittock v. O'Niell, 63 Pa. 253; Neeb v. Hope, 111 Pa. 151; Towns., Lib. & S., § 211; Folkard's Starkie, Lib. & S., § 692; Odgers, Lib. & S., 170* [Text Book S., 129].

*Mr. Wm. W. Wiltbank* and *Mr. Benj. Harris Brewster*, for the defendant in error:

1. We submit: (1) The article is libelous per se: Odgers, Lib. & S., 169; McCorkle v. Binns, 5 Binn. 340; Neeb v. Hope, 111 Pa. 145. (2) When a writing is libelous per se, malice is implied, and actual damage need not be shown. General damage only need be alleged; damage to the feelings and reputation.

2. The only defences could be, (1) Justification on the ground that he was ridiculous; (2) Justification on the ground of privilege. Both should be specially pleaded. But the only defence made was that the interview had taken place. There was no pretence of justification of the dressing or spicing of the article; nor was it pleaded that a school teacher was a public officer, who, as was afterwards argued, might be ridiculed with impunity, so long as express malice was not shown.

3. Plaintiff's thirteenth point does not say that the subject was privileged, but rightly says the matter was of public interest. The court answered that malice was the only limit,

but that it might be found in the article itself, which was consistent with all the authorities: Cook v. Ward, 6 Bing. 409; Struthers v. Peacock, 3 W. N. 517. The court was bound to state the law; Mr. Fox's bill does not apply to civil actions: Pittock v. O'Niell, 63 Pa. 257; Barr v. Moore, 87 Pa. 385.

4. If the article was libelous per se, it was not a fair account, and whether or not it was libelous per se could not have been left to the jury. Malice may be inferred from the publication itself: Wright v. Woodgate, 2 Cr. M. & R. 573; Cook v. Wildes, 5 E. & B. 328; Gilpin v. Fowler, 9 Exch. 615.

Attention is called to the unanimous opinion of the court below in its refusal of the motion for a new trial.

OPINION, MR. JUSTICE PAXSON:

We have had the benefit of a re-argument in this case. It was ordered of our motion in view of the importance of the principles involved.

There are forty-five assignments of error. A far less number would have covered all the points involved. They are interesting, however, as illustrative of the ingenuity of the learned counsel for the plaintiff in error. It would serve no good purpose to consider them in detail. It is sufficient to indicate briefly the principles upon which the case must be decided.

The plaintiff brought an action on the case against the defendant below, The Press Company, Limited, to recover damages for the publication of an alleged libel in " *The Press,*" a daily paper of the city of Philadelphia. The plaintiff had leased rooms in the vicinity of Thirteenth and Market streets, and fitted them up as a school for clerks, salesmen, and reporters, and he professed to be a teacher of short-hand writing, type-writing, and phono-scribing. The outside of his rooms appears to have been alluringly placarded with signs, and various devices in the way of circulars were scattered broadcast in the community calling attention to the merits of his system, and urging the young to engage with him as pupils. It must be conceded that some of these circulars were of a very extravagant nature. It so happened that the attention of the city editor of *The Press* was attracted by the peculiarity of the plaintiff's signs, and he detailed a reporter upon the

staff. of that paper to visit the establishment and ascertain its character. He did so, and *The Press* next day contained the report of the interview. It is this report which forms the subject of the alleged libel. The article is of considerable length, and as it will doubtless appear in the report of the case, is omitted here. The plaintiff claims it was a libel because it exposed him to ridicule, and was calculated to injure him in his business as a teacher. It is proper to say that he had sold his establishment to other parties prior to the publication complained of, reserving, however, a certain royalty, or payment per head, for each student under the new management. The parties to whom he sold do not appear to have been impressed with the thought that their business had been or would be injured by the article in question; at least they are not complaining, and may have regarded it as a "puff" of their school.

The defendant filed what was substantially, though not perhaps in strict technical form, a plea of justification. It alleged that the article in *The Press* was a just and true account of the interview between its reporter and the plaintiff, and asked the court to instruct the jury that "if they believe that the publication complained of is a fair and true account of an interview had between the plaintiff and Mr. Cooke, your verdict must be for the defendant."

The court declined to affirm this point, and herein we think the learned judge erred. While the truth would not have been a defence to an indictment, the rule is otherwise in a civil suit for damages. This is horn-book law. For this error at least the judgment must be reversed. But there is a more serious difficulty underlying the plaintiff's case.

A considerable number of the assignments of error raised the question in various ways whether the article was a privileged communication, and the court was asked to say that in the absence of proof of actual malice there could be no recovery. The court declined to say this, but on the contrary charged that the jury might infer malice from the article in question.

We had occasion in Briggs v. Garrett, 111 Pa. 404, to discuss at some length the question of privileged communications. I do not propose to go over the same ground again. It is sufficient to refer to the conclusions arrived at in that

case. It was there said that "a communication to be privileged must be made upon a proper occasion, from a proper motive, and must be based upon reasonable or probable cause. When so made, in good faith, the law does not imply malice from the communication itself as in the ordinary case of libel; actual malice must be proved before there can be a recovery. And whether a communication be privileged or not is a question for the court, not the jury."

Tested by this rule we are of opinion that the article in question is privileged, not absolutely, but in a qualified sense; in that sense, however, which makes it the duty of the court to instruct the jury that it is privileged, and that because of such privilege no presumption of malice arises from the mere fact of publication, but malice must be proved as a fact in the cause before the plaintiff can recover.

If we are asked why this article is so privileged, I answer, because it was proper for public information. This plaintiff was holding himself out to the world as a teacher and guide of youth; he was seeking to attract them to his place by signs, placards, and advertisements, some of them at least of an extraordinary nature. This gave him a quasi public character. Whether he was a proper person to instruct the young, and whether his school was a proper place for them to receive instruction, were matters of importance to the public, and *The Press* was in the strict line of its duty when it sought such information and gave it to the public. And if that information tended to show that the plaintiff was a charlatan and his system an imposture, the more need that the public, and especially parents and guardians, should be informed of it.

Aside from this we do not regard the article as a libel. At most it is a harmless bit of pleasantry in which the reporter has succeeded in making himself somewhat ridiculous. The matter has been very much magnified and an importance attached to it which it does not deserve. An actionable libel cannot be created out of nothing.

As the publication was privileged, and there was no proof of malice, the court below should have given the jury a binding instruction to find for the defendant.

Judgment reversed.