PROVOSTY, J.
While the contest between New Orleans and San Francisco was going on in Washington before Congress for being chosen as the place where the Panama Exposition should be held, and at the moment when the contest was at its hottest and bitterest, Mr. R. B. Lee, one of the New Orleans delegates for conducting the contest in Washington, a representative more especially of the labor interests of Néw Orleans, met the plaintiff at the American Federation of Labor headquarters in Washington, and, in the course of a discussion which then took place between them on the question of the Exposition, the plaintiff expressed himself as favoring San Francisco, giving as his reason that the labor organization in; that city was better paid, and that its getting the Exposition would benefit labor more. Plaintiff was, at that time, the second vice president of the International Brotherhood and Helpers, which is a branch of the American Federation of Labor, and Ms influence as such was thought to be more or less potent in Washington with certain members of Congress. In view of that fact, and as he was a resident of New Orleans, and more or less a representative of the New Orleans labor organizations, the news of this attitude of Ms caused quite a commotion among the New Orleans delegation in Washington and excited a good deal of angry feeling. On that same day, as we understand, the plaintiff and Messrs. Lee and Harrison, the latter representing in Washington the labor interests of New Orleans in the endeavor to secure the Exposition for New Orleans, met in the room of the two latter at the hotel, and while they were discussing this hostile attiude of plaintiff, and seeking to bring him over to the side of New Orleans, Mr. Denechaud, another of the New Orleans delegates, came into the room. Plaintiff was introduced to him as “the man who was knocking New Orleans,” and Mr. Denechaud joined forces with Messrs. Lee and Harrison in the endeavor to bring Mm over. Plaintiff became violently angry; abused New Orleans in language too vile to be even orally repeated, let alone written; and announced Ms liberty of action and his determination to favor San Francisco. He denies all this on the witness stand, but the proof is positive from the other three. This hostile meddling of plaintiff in the fight was considered to be an ugly feature in the situation, and, naturally, was at once reported to the New Orleans papers; and the defendant company’s paper, the Daily Picayune, in its issue of the next morning, January 20, 1911, referred to it in its column of Washington news as follows;
*591 “One of the embarrassing reports turned into the New Orleans headquarters to-day was that M. Flanagan, international vice president of the blacksmiths’ order, whose home is in New Orleans, but who is on the road much of the time, is working in behalf of San Francisco among the laboring men. He was met in the lobby during the meeting of the executive committee of the American Federation of Labor to-day by New Orleans workers, and was heard to boast of his work for Mayor McCarthy, the labor mayor of San Francisco.
“It is feared that but one of the labor Congressmen in the House will come to the support of New Orleans when the vote is taken on the Estopinal bill.”
One of the things said to plaintiff by Messrs. Lee, Harrison and Denechaud, in the course of their discussion, was that if plaintiff persisted in his hostile attitude to New Orleans he would certainly he written up by the New Orleans papers; and, sure enough, The Daily Picayune in its issue of January 20, 1911, contained the following, which appeared in a section of the paper devoted to the said contest going on in Washington:
“Many of the prominent local labor unionists of the city of New Orleans are up in arms over the alleged glaring disloyalty to his home town of Tom Flanagan, international vice president of the Blacksmiths’ and Helpers’ 'Union, who, it is said, while in Washington, worked tooth and nail in the interests of San Francisco in the fight for the Panama Exposition, and even went so far as to flaunt in the faces of the gentlemen of the local committee the declaration that he was with Mayor McCarthy, of the city of the Golden Gate.
“There were many labor unionists spoken to yesterday who had a good word for Flanagan, and one man who is recognized as a leader in labor’s ranks said that he was quite certain that some action would be taken by the organization in New Orleans to call Flanagan to account for his action.
“Another prominent leader spoke of Flanagan as the rankest kind of traitor, and accused him of being in the service of the Southern Pacific Railroad Company, for which big corporation the men of the union worked in Algiers.
“Flanagan’s antecedents were traced back as far as possible. It was discovered that he was born in this city, and lived the better, part of his life in the First and Tenth wards. He was notoriously opposed to Mayor Behrman and all 'the leaders of the regular Democratic party, and carried his opposition to extreme ends, even declaring himself against the city in which he was bom and where he made his living.
“Flanagan’s union is not vei^ strong in New Orleans; in fact, it is practically nonexistent on this side of the river; but in Algiers the organization is known in a limited sphere, most of its members being in the employ of the Southern Pacific, for which -corporation Flanagan is alleged to work.
“A recognized leader in the local labor movement said last night that Flanagan should be driven out of town and given the cold shoulder by all self-respecting Orleanians.
“ ‘Why, the Central Trades and Labor Council, the Building Trades Council, the Dock and Cotton Council and nearly every separate labor organization in the city have come out openly and loyally in an advancement of our home town,’ said the leader; ‘and now here comes this fellow and tries to discredit us in the eyes of our^ people. If I had my way with him, I’d pull him as a dangerous and suspicious character when he dares to show his brazen face in our midst again, and give him a term in jail.’
“As Flanagan’s union is not affiliated with the central bodies in New Orleans, it is not thought that the unions can take any action against him in the way of expulsion or censure.
“Flanagan formerly lived in Magnolia street, near Erato ; but now resides in Claiborne street, above Felicity, in the Tenth ward. The man spends much of his time on the road organizing-unions, and was last here about four weeks ago.”
And. in the issue of the same paper on the next day appeared the following:
“A committee representing Local No. 229, International Brotherhood of Blacksmiths and Helpers, denounced Thomas J. Flanagan, fourth vice president of the union, last night. Frank Heuer, president of the local, said that Flanagan had no authority to represent the local in-Washington.
“ ‘The members of our local have always been in favor of New Orleans, and we have indorsed the city in resolutions,’ he said. ‘The disloyalty of Flanagan is distasteful to every true union man in the United States, and I am sure that he hurt the cause of San Francisco rather than assisted it. A traitor cannot help any cause.’
“The committee also denied the statement that the local was of little consequence, and was almost nonexistent. President Heuer said that the local is in the best possible condition. There are seventy-five members in good standing, and the delegates have great influence in labor councils.
“The committee which denounced Flanagan was composed of Frank Heuer, George W. Creher, secretary, .and T. J. Casey.”
Messrs. Heuer and Creher, here named, deny that they made the statements attributed to them in the second paragraph of this lasf excerpt; but the city editor of the paper, and one of its local reporters, who was call *593 ed in for taking down the statements of the said committee, testify that the statements were taken down as made, and were read to the gentlemen in order to make sure of the correctness of the report. The third committeeman, Mr. Casey, did not testify. The reason of the committee calling was for procuring the correction of that part of the publication of the 21st where it was said:
“Flanagan’s union is not very strong in New Orleans; in fact, it is practically nonexistent on this side of the river.”
Plaintiff charges that the publications were a libel upon him, and sues in damages.
The answer, after denying that said publications were false or malicious, proceeds as follows:
“Defendant avers, on the contrary, that the statements made in said articles were true and correct, and were published without any malice or ill will toward the plaintiff.
“Defendant specially denies that it was actuated by any malice or ill will toward the plaintiff in publishing said article, and it avers that said plaintiff is not personally known to it, and that he has not been affected or injured in any degree or in any way by the said publications.
“Defendant further specially avers that the said article was published for the information and advantage of the public; that the statements therein contained were derived from responsible persons to whom and in whose presence the plaintiff had indulged in an awful tirade of abuse against the city of New Orleans, declaring, among other things, as follows:
“ T don’t owe New Orleans anything, and I’ll work as hard as I -please for San Francisco. To hell with New Orleans.’
“And defendant in said article did report and comment on said acts of plaintiff without malice toward the plaintiff, but in such terms as such acts naturally call forth.
“Defendant avers that the campaign between New Orleans and San Francisco for the Fair in celebration of the opening of the Panama Canal took on proportions of a mimic war, in which the spectacle of a resident of New Orleans openly opposing his own city was unique, and was an item of special news interest calling for fitting and defensive comment;' that respondent, in its function of giving to public sentiment a voice, had a certain freedom and latitude, which it by no means exceeded, in dealing with the surprising and almost solitary stand taken against his home city by the plaintiff herein, who, by his attitude, made himself a public figure, subject to becoming animadversion and comment; that respondent imputed to plaintiff nothing which was actually derogatory, but that, as a live and progressive newspaper, and as the leading advocate of the Exposition among the newspapers of the city, it devolved upon respondent to twit any Orleanian for not giving to New Orleans, over San Francisco, the benefit of the sentiment laid down in Scott’s works, verbo ‘Fatherland,’ as follows:
“ ‘Breathes there a man with soul so dead Who never to himself hath said:
This is my own, my native land?
Whose heart hath ne’er within him burned As home his footsteps he hath turned
From wandering on a foreign strand?’ ”
Referring to the second of the above-transcribed excerpts, the petition of the plaintiff alleges:
“That said publication, under guise of pretending to repeat what other persons whose names are not given, wickedly, maliciously and unlawfully without cause or justification attacks the personal character of petitioner for honesty; describes him as ‘the rankest kind of a traitor’ as influenced by improper motives in favor of the Southern Pacific Railroad Company: ‘that he should be driven out of town and given the cold shoulder by all self-respecting citizens;’ describes him as ‘this fellow’ — whom the undisclosed commentator ‘if he had his way would have (him) pulled as a dangerous and suspicious character.’
“That from these expressions, and from the tenor of the entire article, it is manifest that the same was written and published in spite and malice; that it was so published for the express purpose to suggest dishonest motive (if the main charge were true, which is denied), to humiliate petitioner as a man, discredit him as a citizen and generally to cast upon him obloquy and contempt.”
And in another paragraph the petition refers to the headline of the publication of .Tanuary 22d, to wit, “Flanagan’s own union here denounces him as a traitor,” and charges that the same constituted a libel.
In the brief of plaintiff’s learned counsel, it is said that the accusation against plaintiff of his having favored San Francisco is founded upon nothing but the idlest of rumor —not traced to any source — and that it is, as a matter of fact, false; and the case is summed up as follows:
“If the plain text of the articles and the great recklessness with which they were paraded in flashy headlines do not strike the fair and impartial mind with the conviction that unwarranted liberty was taken upon the name and person of this plaintiff, fio refinement of definí *595 tion would assist to find the right solution. 'The obvious purpose was primarily to hold up the plaintiff to ridicule, scorn, contempt, and humiliation, and behind and within this there is an attack on his common honesty and worth as a man. The ‘rankest kind of a traitor’ * * * in the service of the Southern Pacific Railroad Company, etc. * * * ‘Everbody knows that the S. P. R. Co. wanted San Francisco to get the Exposition.’ The inference is self-evident: ‘For which corporation Flanagan is alleged to work,’ i. e., in getting the Exposition.
“And now here comes this fellow: ‘ * * * If I had my way with him I’d pull him as a •dangerous .and suspicious character when he dares to show his brazen face in our midst again and give him a term in jail.’ ‘The man (?) spends much of his time on the road organizing unions and was last here four weeks ago.’ ”
In the same brief, plaintiff is referred to ■as follows:
“The plaintiff, Thomas Flanagan, is a ‘blacksmith by trade.’ He has evidently distinguished himself' among his ‘Follows,’ for they advanced him to high office, viz., to that of vice president of ‘The International Brotherhood and Helpers,’ which is a ‘Branch of the American Federation of Labor.’ And thus he has been lifted from the soot and fire of the furnace and the clang of the hammer and anvil to the higher domain where mind and spirit and sympathy struggle to relieve hardships and ameliorate distress. This duty calls him from the workshop to council chambers .and he is almost constantly ‘abroad,’ traveling from place to place, wherever called by co-workers or superiors, •completely absorbed in his work.
“This is not a fancy sketch; it is one taken from the Record.”
[1] The malice imputed to the defendant •company is not personal ill will, but merely legal malice, or that deduced by the law from tile willfully and wantonly doing of an unlawful act resulting in injury to another.
[2] The words “traitor,” “dangerous and suspicious character,” and “fellow,” and “should be driven out of town and given the cold shoulder by. all self-respecting Orleanians," do have a very disparaging meaning; and their application to a man of standing in ,a community, especially by a newspaper of large circulation in that community, is no doubt calculated ordinarily to injure. But the connection in which words are used control their signification, and the expressions here in question might well be used in a connection altering their ordinary meaning; and we think they were so used in th°e present case. Their sum and substance in the present case amounts to nothing more than to the charge that the plaintiff, being in Washington and occupying there a position of influence which he might have used in the interest of Newt Orleans, his home town, chose to use it on the contrary in the interest of her rival in the bitter contest going on between them. This conduct appeared to the newspaper to be deserving of the condemnation thus visited upon it, and to call for the expression in question; and, doubtless, a majority of the people of New Orleans felt in the same way.
[3] That words arej to be understood in the connection in which they are used, and are not to be attributed a signification other than that which the context would show them to have, is abundantly established in the law of libel and slander.
“The leading English, case on this subject is one cited in Lord Cromwell’s Case (1578) 4 Rep. 13, 14: ‘If a man brings an action, on the case calling the plaintiff murderer, the defendant will say that he was talking with the plaintiff concerning unlawful hunting, and the plaintiff confessed that he killed several hares with certain engines; to which the defendant answered and said, “Thou are a murderer” (innuendo the killing- of the said hares). * * Resolved by the whole court, that the justification was good. For in case of slander by words, the sense of the whole words ought to be taken, and the sense of them appears by the oause and occasion of speaking of them, for sensus verborum ex causa dicendi aecipiendus est et sermones -semper accipiendi sunt, secundum subjeetum. * * * And it was said, God forbid that a man’s words should be by such strict and grammatical construction taken by parcels against the manifest intent of the party upon consideration of all the words which import the true cause and occasion which manifest the true sense of them; quia quae ad unum finem loquenda sunt, non debent ad alium detorqueri ; and, therefore, in the said case of murder the court held the justification good; and that the defendant should never be put to the general issue when he confesses the words and justifies them, or confesses the words and by special matter shows that they are not actionable.’ Shipley v. Todhunter, 7 C. & P. 680; Odgers on L. & S. 109.” Newell on Slander and Libel, p. 275.
*597 To the same effect is the following:
“But where the words complained of ai;e, ■“Thou arta thief, for thou toolcest my beasts by - reason of an execution, and I will hang thee,’’ no action lies, for it is clear that the whole sentence taken together imports only a chai-ge of trespass. Wilk’s Case, 1 Boll. Abr. 51; Smith v. Ward, Cro. Jac. 674; Sibley ' v: Tomlins, 4 Tyrw. 90.” Newell on Slander and Libel, p. 276.
The rule is generalized, and is thus laid down by Newell:
“Defamatory words which are apparently actionable, but which are susceptible of :am explanation by reference to some particular transaction to which they are known by those in whose presence they were spoken to refer, are to be construed accordingly and with reference to such transaction.” Newell on Slander and Libel, p. 292.
Newell also cites a case in illustration, of the foregoing proposition.
“The declaration charging the defendant with speaking the following words: ‘John Keating is as damned ,a rascal as ever lived, and all who joined his party and procession on the Fourth of July (meaning the said plaintiff, John Van Rensselaer, and the party and procession in which the said John Keating acted as ’captain on said Fourth of July) are a set of black-heart-ed highwaymen, robbers, and murderers.’ At the trial the words were proved to have been spoken as alleged. On the part of the defendant it appeared that on the day previous to the speaking of the words there had been a public procession to a church in Lansingburgh, where the parties resided ; and that Keating commanded an artillery company, which formed a part of the procession, attended with music; that a Mr. Bird claimed one of the instruments used, and went to the church to demand it. .It. was. not given up, and a fray ensued, in which Mr. Bird was dangerously wounded. It also appeared that the conversation in which the words were spoken was understood by those who heard it to relate to the transactions of the preceding day, and that the terms ‘highwaymen, l'obbers, .and murderers’ were used in reference to the treatment of Mr. Bird in withholding the instrument and wounding him. The jury' having found a veidict for the plaintiff, on appeal to the Supreme Court it was held that, as the words spoken by defendant were clearly undei-stood to apply to the transactions of the- preceding day, and as these were known not to amount to charge which the words would otherwise, import, the verdict was set aside.” Van Rensselaer v. Dole, 1 Johns. Cas. 279 (1800).
A case which goes even further than this is that of Artieta v. Artieta, Í5 La. Ann.--48, where the court said:
-“The plaintiff’s conduct in calling the defendant, his brother, a ‘rogue,’ within the hearing of some bystanders, is certainly very reprehensible. But as this was done in a moment of irritation, and in refei'ence to the defendant’s unwillingness to reimburse what had been disbursed for his account, and as no injury appears to" have resulted, or could have resulted, from his transient expression of angry feeling, the alleged case of defamation is not actionable.”
Doubtless, the expressions were very forcible, but as said by this court in the case of Tate v. Nicholson, 122 La. 479, 47 South. 776:
“In determining the question of the liability of the defendant, it is our duty to take into consideration all the circumstances of the case. We should give weight to every fact having a legal bearing on the publication. We must eon'sidfer the occasion on which it is made, to ascei'tain how far, in view of that occasion and of everything that was then said by the defendant with reference to the mattei’S published', whether the publication should, as to its character, be held to be libelous or not. Our conclusion must be based upon the situation taken as a whole.”
These publications were made at a time of great public excitement when exaggerated expressions were rather to be expected. Plaintiff himself says of the situation, in his petition:
“The city of New Oi’leans was an ai-dent and earnest applicant — her people expending much money and under sanction of a constitutional amendment, the people of the entire state of Louisiana' had voted to tax themselves to provide means satisfactory to the government of the United States for holding said Exposition, * * * and much interest and excitement prevailed about the matter. Large delegations of the citizens of New (Means at great expense went personally to the city of Washington, to protect and advance officially before the committees of Congress and by personal influence with members of Congress, the interests of the city of New Orleans in the pi’emises. The entire public px-ess of this city, and px-aetically •.the state, manifested great interest,_ and all the newspapers were filled daily with news, comments, interviews, etc., concerning the progress of affairs at the Capital, in Congress before committees and executive officers.”
In fact, the two Houses of the General Assembly as a whole adjourned over to Washington as a delegation or lobby committee.
These circumstances explain and go towards excusing the severity of the language used. The public mind was wrought up, and *599 plaintiff, a citizen of New Orleans, and a representative of her labor organizations, was using bis position of vantage in Washington against New Orleans.
In the case of Mihojevich v. Bodechtel, 48 La. Ann. 618, 19 South. 672, this court said:
“Slanderous epithets are not always actionable. An exception to the general rule is found iu. the case of a single woman, eighty years of ag'e, suffering from a real or fancied wrong, who makes use of vile epithets as a means of defense. The damages occasioned thereby are more seeming than real, and the cause of action may be appropriately relegated to the domain of damnum absque injuria.”
“True it is that such words as ‘dirty rat’ and ‘thief,’ and ‘swindler,’ ‘thief,’ and ‘rat,’ .are bad enough in their way, and little suited to ears polite; but, under all the circumstances surrounding this ease, we do not feel disposed to give them the significance that is claimed for them by plaintiff’s counsel. On the contrary, we are disposed to regard them .as the irate and impulsive utterances of an old woman, whose only means of defense against a fancied or real wrong, which she had suffered at the hands of the plaintiff, w.as an unruly and mischievous tongue.”
A similar question, having arisen in Simons v. Lewis, 51 La. Ann. 327, 25 South. 406, the court again laid the rule down as follows:
“In suits, for damages for slander, the defendant is entitled to the modification the words receive from the accompanying statements showing the meaning intended and understood by those to whom the words were addressed. New-ell on Slander, p. 292 et seq.”
“On the issue of malice, in such cases, .as well as to mitigate damages, testimony is admissible to show the occasion, the sense of wrong, and other circumstances attending and prompting the expressions alleged to be slanderous. [Gilbert v. Palmer] 8 La. Ann. 130; [Artieta v. Artieta] 15 La. Ann. 48.”
Be the foregoing as it may, however, there can be no doubt in this case that the publications were made from no wrong motives, or ill will towards the plaintiff, but simply in furtherance of the campaign that was theD being carried on; and that, if not entirely justified, they were privileged.
Although plaintiff’s mission in Washington was not connected with this particular campaign, yet the evidence shows that he was taking part in it; and, as he- was the known representative of labor organizations, he was not occupying an entirely private position. I-Iis status was more or less that of a public-man, and entailing upon him a degree of public responsibility which privileged the public press to comment upon his acts. Oftentimes what is said or done by persons so situated— quasi public, as it were — becomes a matter of public concern. Thus:
“The action of a priest in the discharge of his duties and office, in conducting the public functions of his calling, is the proper subject of comment in the public press, for which, within proper limits, an action of libel will not lie.” Klos v. Zahorick, 113 Iowa, 161, 84 N. W. 1046, 53 L. R. A. 235.
“And such comments are privileged, no matter how severe, when made in support of some public contention, and in good faith.” Odgers, Libel and Slander, 34-36.
“The editor of a newspaper has the right, if not the duty, of publishing, for the information of the public, fair and reasonable comments, however severe in terms, upon anything which is made by its owner a subject of public exhibition, as upon any other matter of public interest; and such a publication falls within the class of privileged communications for which no action can be maintained without proof of-actual malice.” Gott v. Pulsifer, 122 Mass. 238, 23 Am. Rep. 322.
The article complained of being a privileged one, does it contain anything that is libelous per se? “Words ordinarily slanderous may not be so spoken by the party in the performance of public or official duty, upon a just occasion, and without malice.” Mayo v. Sample, 18 Iowa, 306.
The following subjects have been held to be legitimate subjects of newspaper comment and criticism:
A book and Its author’s views. Cooper v. Stone, 24 Wend. (N. Y.) 434.
The manager of an Italian opera. Fry v, Bennett, 28 N. Y. 324.
A clergyman in his ministerial duties. Shurtleff v. Stevens, 51 Vt. 501, 31 Am. Rep. 698.
A teacher of stenography who advertised publicly for pupils. Press Co. v. Stewart, 119 Pa. 584, 14 Atl. 51.
The projector of a railway and his work. Crane v. Waters, 10 Fed. 619.
The “Cardiff Giant,” a stone image of a *601 man, exhibited to the public. Gott v. Pulsifer, 122 Mass. 235, 23 Am. Rep. 322.
A public dinner served by a caterer. Dooling v. Budget Pub. Co., 144 Mass. 258, 10 N. E. 809, 59 Am. Rep. 83.
A public building being erected by a city. Bearce v. Bass, 88 Me. 521, 34 Atl. 411 51 Am. St. Rep. 446.
A flower show. Green v. Chapmen, 4 Bing. (N. C.) 92; 5 Scott, 340.
In a case from Iowa, the following criticism of a theatrical performance was held to -be wdtbin the bounds of legitimate criticism;
“Effie is .an old jade of fifty summers, Jessie a frisky filly of forty, and Addie, the flower -of the family, a capering monstrosity of' thirty-five. Their long, skinny arms, equipped with talons at the extremities, swung mechanically, and anon waved frantically at the suliering •audience. The mouths of their rancid features opened like caverns, and sounds like the wailing of damned souls issued therefrom. They pranced around the stage with a motion that suggested a cross between the danse du ventre -and fox. trot — strange creatures, with painted faces and hideous mien. Effie is spavined, Addie is spring-halt, and Jessie, the only one who show'ed hpr] stockings, has legs with calves as classy in_thejr_" outlines as the curves of a broom handle’.”
In passing upon the above article, the court said:
“One who goes upon the stage to exhibit himself to the public, or who gives any kind of a performance to which the public is invited,' may be freely criticized. He may be held up t<f ridicule, and entire freedom of expression is guaranteed dramatic critics, provided they are not actuated by malice or evil purpose in what they write. Pitting strictures, sarcasm," or ridicule, even, may be used, if based on facts, without liability, in the absence of malice or .wicked purpose. The comments, however, must- be based on truth, or on what in good faith and-upon-probable cause is believed to be true, and the matter must be pertinent to the conduct that is made the subject of criticism. Freedom of discussion is guaranteed by our fundamental law. and a long line of judicial decisions. As said in the Gott Case, 122 Mass. 238, 23 Am. Rep. 322, the editor of a newspaper has the’ right, if not the duty, of publishing, for the informa-, tion of the public, fair and reasonable comments, however severe in terms, upon .anything which 'is; made by its owner a subject of public exhibition, as upon any other matter of public interest; and such a publication falls within the class of privileged communications, for which no. action will lie without proof of actual malice. See, also, Eastwood v. Holmes, 1 Fost. & F. 347; Paris v. Levy, 9 C. B. N. S. 342; Donaghue v. Gaffy, 53 Conn. 43, 2 Atl. 397; “Carr v. Hood, 1 Campb. 255, note. Surely, if one makes himself ridiculous in his public performances, he may be ridiculed by those whose duty or right it is to inform the public regarding the character of the performance. Cooper v. Stone, 24 Wend. (N. Y.) 434. Mere exaggeration, or even gross exaggeration, does not of itself make the comment unfair. It has been held no libel for one newspaper to say of another, ‘The most vulgar, ignorant, and scurrilous journal ever published in Great Britain.’ ” Cherry v. Des Moines Leader, 114 Iowa, 298, 80 N. W. 323, 54 L. R. A. 855, 89 Am. St. Rep. 365.
A similar ruling is found in Cleveland Leader v. Nethersole, 84 Ohio St. 118, 95 N. E. 735, Ann. Cas. 1912B, 985.
. The privilege rests on two distinct grounds;
" (1) It was within the province of the newspaper to comment on the incident as a matter of news and of general public interest.
(2) The appearance of plaintiff in the arena at Washington as a champion of San Francisco made him, pro htec vice, a public figure subject to such attack, condemnation, and ridicule, as is appropriate and necessary in a .campaign where public opinion is sought to be molded.
" The contention is made that after all has been said the circumstances can only mitigate defendant’s conduct, and not justify it; and .that therefore, even if punitory damages cannot be recovered, there should, at any rate, oe awarded actual damages, such as for the "injury to plaintiff’s feelings. We think the "publications were, under the circumstances, privileged; and therefore not actionable at all.
Judgment affirmed.