88 521
90 302
88 521
91 440

SAMUEL R. BEARCE, and another,

*vs.*

JOSEPH P. BASS, and another.

Androscoggin.  Opinion February 29, 1896.

*Libel.  Privileged Communication.  Innuendo.*

The plaintiffs had contracted to build the Bangor City Hall, a public building designed to be used and occupied by the government of the city for public purposes, estimated to cost one hundred thousand dollars.  While the construction of this building was in progress, an article was published by the defendants in their paper, and that portion of which, claimed to be libelous, is as follows: " The mason work is of the poorest quality and it should not be accepted by the city.  Too much sand has been used in the mortar, and to such an extent, that it does not prevent the alkali, which is the life of the mortar from running out, as can be seen by the white appearance of the building.  Very many of the bricks are loose, the mortar being too lifeless to hold them together, and the contractors should be obliged to take down and replace the imperfect sections of the walls.  The doings of the old Tweed ring in New York, were no worse than much that has been done in connection with our city building."

*Held*; That the language complained of was but a fair and reasonable criticism upon the work which entered into the construction of this public building, and constituted no attack upon the character of the plaintiffs, either as individuals or in their business as contractors.

The character of the construction of such a building was a matter of public importance and interest to the inhabitants and tax payers, and was therefore a matter of legitimate public discussion by the defendants as well as all others who had, in common with the rest of the community, a public and a private pecuniary interest in this important public work.

Every one has a right to comment on matters of public interest and concern, provided he does so fairly and with an honest purpose.

Such comments or criticisms are not libelous, unless they are written maliciously, or there is averment and proof of special damage, or unless they go further and attack the individual.

There is a material difference between criticisms or attacks upon a public work, and upon the individual.

Every man has a right to discuss freely, so long as he does it honestly and without malice, any subject in which the public are generally interested, and to state his own views for the consideration of all or any of those who have a common interest in the subject.

So long as the criticism is confined to the work, and does not attack the moral character or professional integrity of the individual, and is fair and reasonable, it is not libelous, because it is no defamation of the individual.

But when the comment or criticism of the man's work becomes an attack on his private or business character, then the element of malice comes in and stamps the language as libelous.

Language cannot become libelous where the malice is shown to be against the private or business reputation of some person other than the plaintiff's, no matter to what extent such malice may exist.

In regard to matters of public interest, all that is necessary to render the words spoken or published privileged is, that they should be communicated in good faith, without malice, to those who have an interest in the subject matter to which they refer, and in an honest belief that the communication is true, such belief being founded on reasonable and probable grounds.

When the matter complained of is privileged, the burden of proving malice lies on the plaintiff, and the defendant cannot be called on to prove that he was not actuated by malice until some evidence of malice towards the plaintiff, more than a mere scintilla, has been adduced by the plaintiff.

The office of an innuendo is to explain what is already expressed, but not to enlarge or change the sense of the previous words.

ON MOTION AND EXCEPTIONS.

This was an action of libel, brought by the plaintiffs, who are contractors, against the defendants, who are proprietors and publishers of the Bangor Daily Commercial. The alleged libel was published March 28, 1894, during the progress of a municipal campaign in Bangor in which the election of F. O. Beal for mayor was pending. Plea, general issue and brief statement of special matters in defense. The jury returned a verdict of $1508.03, and the defendants moved for a new trial and filed exceptions.

The alleged libel as stated in the declaration is as follows : . . .

"The mason work" (meaning the mason work of the said City Hall, which was in process of construction by the plaintiffs as aforesaid), "is of the poorest quality" (meaning and intending that said work was inferior in quality to that called for by the contract aforesaid), "and it" (meaning said mason work) "should not be accepted by the city" (meaning the city of Bangor aforesaid, and meaning and insinuating that the said work should not be accepted because of the said inferior quality thereof, and because it was not in accordance with said contract). "Too much sand has been used in the mortar," (meaning the mortar used in the construction of said City Hall, and meaning and intending that said mortar had too large a proportion of sand among the ingredients thereof, and meaning that the said mortar

was improperly mixed and prepared for use in said building) " and to such an extent that it does not prevent the alkali, which is the life of the mortar" (meaning the mortar used in the construction of said City Hall) "from running out" (meaning that some supposed substance called alkali in the said mortar used in the erection of said City Hall, was not prevented from running out of said mortar by reason of said improper mixing of said mortar and putting therein of too much sand) " as can be seen by the white appearance of the building" (meaning the said City Hall, and meaning that by reason of the putting in of an excessive amount and improper proportion of sand in the said mortar, the said City Hall had a white appearance caused by the running out of the alkali from said mortar). "Very many of the bricks" (meaning the bricks theretofore used in the construction of said City Hall) "are loose" (meaning and intending thereby that the said bricks were not properly laid by the plaintiffs and had become loose by reason thereof) "the mortar," (meaning the aforesaid mortar used in the construction of said City Hall in which said bricks were laid) "being too lifeless to hold them together" (meaning and intending that said mortar had been improperly mixed by the putting in of too much sand, and that thereby the said mortar was not strong enough to hold the said bricks together, as laid in said building) "and the contractors" (meaning the plaintiffs) "should be obliged to take down and replace the imperfect sections of the walls" (meaning and intending the walls of said City Hall, heretofore already constructed by the plaintiffs, and meaning and intending that sections of said walls had been imperfectly constructed by said plaintiffs and contrary to the contract for constructing the same). "The doings of the old Tweed ring in New York" (meaning and intending and referring to a certain combination and conspiracy of men in the city of New York, being the officers, agents and servants of said city, who corruptly and wickedly, and for their own corrupt gain, conspired with contractors, who had contracted to erect public works for said city of New York, whereby said contractors corruptly divided the proceeds of their said contracts with the men composing said corrupt combination

and conspiracy) "were no worse than much that had been done in connection with our City Building" (meaning said City Hall and meaning and intending and insinuating that the plaintiffs had corruptly conspired with the agents and servants of said city of Bangor with reference to said contract, and to divide the proceeds thereof). . . .

The following is the entire article in the Commercial:

### "Local Contractors Not Considered.

"We are informed by a former member of the city government who was a member of the committee having charge of matters connected with the new City Building, that he was not allowed to see all the bids which were made by Bangor contractors. He also says that, under the direction of the king boss, our Bangor contractors were requested to hand in their bids for a completed building and in making them to include separate bids for carpenter, mason, plumbing work, etc., and that several of these bids were open, but not shown to other members of the committee.

"Only a few minutes before the expiration of the time to receive bids, the gentleman imparting this information saw the architect, who was allowed to see all the bids of the Bangor contractors, write and seal what appeared to be a proposal, which he handed to the city clerk.

"He also says he made a few suggestions to the mayor relating to the manner in which the business was being done, and what the people were saying about it, to which the mayor replied, 'What in h—l have the people to do about it?' and that he wanted them to understand that he proposed to take charge of all the affairs connected with the new City Building.

"Mr. W. N. Sawyer says he put in a bid for the mason work, but his bid was not placed before the committee. All the Bangor contractors complain of the treatment they received.

"In the spring of 1893 many changes were made in the plans and specifications and to such an extent that such a reliable man as C. B. Brown says would reduce the cost of the building about $15,000, and still the Bangor contractors were not allowed to

put in new bids, but the out of town contractors were allowed to have the contract at their old figures.

" The mason work is of the poorest quality and it should not be accepted by the city. Too much sand has been used in the mortar, and to such an extent that it does not prevent the alkali, which is the life of the mortar, from running out, as can be seen by the white appearance of the building. Very many of the bricks are loose, the mortar being too lifeless to hold them together, and the contractors should be obliged to take down and replace the imperfect sections of the wall.

" The doings of the old Tweed ring in New York, were no worse than much that has been done in connection with our City Building. It is in the hands of a wrecker and how long will the tax-payers of Bangor allow the present state of affairs to exist ? "

Defendants' Exceptions.

The defendants contended,

First. That what they said in the alleged libelous publication was only fair and reasonable comment and criticism upon a a matter of public interest, and under circumstances authorizing the making of the publication, and requested the court to instruct the jury as follows, upon this branch of the case. " That so much of said alleged libel as reads as follows, 'The mason work is of the poorest quality and it should not be accepted by the city. Too much sand has been used in the mortar and to such an extent that it does not prevent the alkali, which is the life of the mortar, from running out, as can be seen by the white appearance of the building. Very many of the bricks are loose, the mortar being too lifeless to hold them together, and the contractors should be obliged to take down and replace the imperfect sections of the wall,' was but a comment upon a public matter which the defendants had a right to make as they did, and for which the defendants are not liable "—which requested instruction, the court refused to give.

The defendants contended,

Second. That the alleged libel was a privileged communication, and that this action was not maintainable without proof of

actual malice from these defendants toward the plaintiffs, and
that the burden of proving such actual or express malice was
upon the plaintiffs. Upon this point, the court instructed the
jury as follows :

"Now, gentlemen, it seems to me that the great question in
the case, and the one to which your attention should be directed
more especially, is with respect to the motive of Mr. Bass.
What were his feelings? What were his motives when he
penned and published that article? . . . You must read it in
the light of the surrounding circumstances and determine as a
question of fact, what his real motive was. Was it spite to
gratify ill will towards Mr. Beal, or was it a publication made in
good faith, without malice, founded on an honest belief, and the
belief itself founded on reasonable grounds? If it was, it was a
privileged communication, and there is no doubt that the defense
is complete."

Again the court said : " But if on the other hand, as is claimed
by the plaintiffs, you are satisfied that it was a malicious publi-
cation, made out of ill will towards Mr. Beal, or from any other
bad motive, and was not in good faith, and was not for the
public interest, and was to gratify his ill will towards Mr. Beal,
and without belief that the same was true, or without probable
cause to believe that it was true, then it was not privileged ; and,
as it was an attack directly on the plaintiffs, in their capacity as
contractors, and if you are satisfied that it did affect them directly
and injuriously, and was naturally calculated to have that effect,
why then, it was a libel. The justification fails and the plaintiffs
are entitled to maintain their action."

" To illustrate what I mean, and that you may see it more
clearly, if a man should fire a gun aimed at A, with a malicious
intent to kill and murder A, and he should miss him, and the
bullet that is fired should hit one of his nearest friends and kill
him, it would be murder. It would be the malicious killing of
B, his friend. He had no malice against him, but the shot was
fired maliciously. The malice towards A would constitute legal
malice towards B, although he did not kill the man he intended,
and killed one of his friends."

"Precisely so in this case. If these charges were knowingly false, and Mr. Bass had no good reason for believing them to be true, and they were not made in good faith, and the charge was aimed more especially at Mr. Beal, on account of his ill will towards Mr. Beal, if it existed, then the fact that he may have had no ill will towards the plaintiffs is no defense. The ill will or malice which actuated him in publishing the article at all so as to injure Beal, supplies in law the want of malice against these plaintiffs." And the court failed to instruct the jury, that the burden of proving express malice on the part of these defendants towards these plaintiffs was upon the plaintiffs.

And the court further instructed the jury : "If a man makes a publication, knowing it to be false, which is injurious to another's business and reputation, the law implies malice ; no direct evidence other than the article itself is needed to prove malice ; because every one is supposed to intend the natural consequences of his acts."

The defendants further contended that the allegations in the alleged libel were true and called a large number of witnesses to substantiate the truth of the allegations. The question of their truth or falsity was not submitted to the jury by the court, unless it was submitted in the following instruction to the jury, and other portions of the charge :

"Generally speaking, the truth is a complete justification for the publication of a matter of this kind under our statute. The statute says that in a suit for writing and publishing a libel, evidence shall be received to establish the truth of the matter charged as libelous, and if its truth is established, it is a justification unless the publication is found to have originated in corrupt or malicious motives. . . This right on the part of a citizen and tax-payer of a town or city to express his opinion on public matters honestly and in good faith is only a qualified privilege. It is not an absolute privilege. It depends upon the truthfulness, or his honest belief of the truthfulness, of the statement, and the absence of malice ; but you will see by the language of this statute it is a justification unless the publication is found to have originated in malice. In some cases the statute implies that

528 BEARCE v. BASS. [88

even the truth is libelous. The truth will be libelous sometimes when published from improper or bad motives. One of the most common illustrations is this: We will say that a young man, beginning in life, has been guilty of some criminal offense committed in his youth and before his judgment and his morals have become fixed. He has been confessedly guilty of some misdemeanor or criminal offense, but in after life he becomes an upright, moral man, is married and has a family of children and it is of no concern or interest to the public that he committed this offense in his youth. And anyone who published it to the world in the form of a writing, may be convicted not only upon criminal prosecution, but the party injured may recover damages, notwithstanding the truth of the writing.

"But, generally, assuming the facts to be as they are claimed to be here, I do not think that that rule would apply. I mean to say to you distinctly, that if the truth of the defendants' brief statement, which I have read to you, is sustained, the article which was published in the Commercial was privileged, because there is no evidence that would justify you in finding that it is a case belonging to the class which I have just given by way of illustration. Being citizens, tax-payers, and publishers of a newspaper in Bangor, admittedly so, it gave them a right to express their opinions on public matters in which the city was interested, and in which they were personally interested, provided they were honestly published and with an honest belief of their truth."

And the court further instructed the jury: "I have endeavored to state to you the hinge of the case; it is not merely whether the charges were true or were false in this publication. Really, it is the honest belief of Mr. Bass, and whether such belief was founded on reasonable and probable cause." . . .

The defendants requested the following instruction: "That plaintiffs are bound by their innuendoes and the meanings ascribed therein to the words published and if the jury find that the plaintiffs have ascribed a wrong meaning to any of the words, or find that any charge as laid in the innuendoes is true, as to such charge, plaintiffs cannot recover," which said instruction the court refused to give.

The defendants requested the court to instruct the jury as follows : ·" The fact that the City Hall has been accepted by the city has no bearing upon this case whatever," which requested instruction the court refused to give.

The defendants also requested the court to instruct the jury as follows : " That so much of said alleged libel as reads as follows : 'The doings of the Old Tweed Ring in New York were not worse than much that has been done in connection with our City Building,' are not susceptible of the meaning ascribed to them in plaintiffs' declaration," which requested instruction the court refused to give.

The defendants requested the court to instruct the jury as follows : "That the words, 'The doings of the Old Tweed Ring were no worse than much that has been done in connection with our city building,' do not apply to plaintiffs," which requested instruction the court refused to give.

To all these instructions and omissions and refusals to instruct the defendants took exceptions.

*A. R. Savage and H. W. Oakes*, for plaintiffs.

What the "Tweed ring " was is now common history. The term "Tweed ring " has been so long and so often used by our people everywhere, that whenever a newspaper charges a combination with being like the "Tweed ring," it suggests to the mind municipal corruption.

That Tweed was a political boss, no one denies ; but that he formed a ring for the purpose of political bossism is not true. The ring was formed in order to enable him to steal from the city of New York by means of public contracts.

Beal, as a boss, could have little to do with the city building after the contract was let ; but as a member of a ring, he might, by dividing the spoils with his co-conspirators.

The plain inference is that there was corruption. In New York the Tweed ring consisted of municipal agents on the one side, and contractors on the other. So in Bangor the ring must necessarily consist of the municipal agents, or agent on the

one side, and the contractors (these plaintiffs) on the other. There is no other reasonable interpretation to be placed upon the language. As the maximum amount to be taken from the city of Bangor was fixed by the contract, the only way Beal and his alleged co-conspirators could wreck or steal was by reducing the quality, and thereby the expense of the work.

Counsel for the defendants, in his argument to the jury, contended that the expression " no worse than " did not imply "the same as." But the mind of the reader of this article would inevitably go out to the history of municipal affairs in New York. It would convey to the ordinary reader no other meaning than that Mr. Beal, who was a candidate for re-election as mayor, had corruptly conspired with Bearce & Clifford for financial gain, growing out of the contract for the building of the new City Hall.

Right in the same connection, Mr. Bass charged that the building was in the hands of a " wrecker," and asked " how long will the tax-payers of Bangor allow the present state of affairs to exist."

If there was no corruption, if the contract financially was being carried out honestly, of what concern would it be to the tax-payers? How would they be affected? The contract had already been made, the sum had been fixed. But, says Mr. Bass, "Mr. Beal is a wrecker." So was Tweed. But Tweed was a wrecker in the corrupt sense ; he was wrecking the city treasury. And if Mr. Beal was a "wrecker," there is no other interpretation to be placed upon the language than that he was wrecking the pockets of the tax-payers of Bangor, a la Tweed.

The article goes on to say, "Very many of the bricks are loose, the mortar being too lifeless to hold them together ;" and ends by saying, "The contractors should be obliged to take down and replace the imperfect sections of the walls." That is, that the work had been faultily, negligently, carelessly, ignorantly constructed, that the work should be torn down. And herein is the gist of the libel.

Words not libelous when merely spoken, often become so when written and published. *Tillson* v. *Robbins*, 68 Maine, 295.

In an action for written or printed slander, though no special damage is alleged, and no averments of such extrinsic facts as might be requisite to make the publication in question import a charge of crime are made, the action is nevertheless maintainable if the published charge is such as, if believed, would naturally tend to expose the plaintiff to public hatred, contempt or ridicule or deprive him of the benefits of public confidence and social intercourse. *Tillson* v. *Robbins*, supra.

Language which concerns a person in a lawful employment is admissible, if, as a natural consequence, it prevents him from deriving therefrom that pecuniary reward which probably otherwise he might have obtained. *Missouri Pacific Railway Co.* v. *Richmond*, 73 Texas, 568; *Hayes* v. *Press Company*, 127 Pa. St. 642.

Words are libelous if they affect a person in his profession, trade or business, by imputing to him any kind of fraud, dishonesty, misconduct, incapacity, unfitness, or want of any necessary qualification in the exercise thereof. Starkie on Slander, § 188.

Words written or spoken of a man, in relation to his business or occupation, which have a tendency to hurt, or are calculated to prejudice him therein, are actionable, though they charge no fraud or dishonesty, and were uttered without actual malice; and, when proved, unless the defendant shows a lawful excuse, the plaintiff is entitled to recover, without allegation or proof of special damages, as both the falsity of the words and resulting damage are presumed. *Moore* v. *Francis*, 121 N. Y. 199.

To write or publish anything that imputes insolvency, inability to pay one's debts, the want of integrity in his business, or personal incapacity or pecuniary inability to conduct it with success, or which impute to him fraud or dishonesty or any mean and dishonorable trickery in the conduct of his business, or which in any other manner are prejudicial to him in the way of his employment or trade, is libelous per se, if without justification and general damages may be recovered. Such publication necessarily, in legal contemplation, tends to injure the credit and standing of the party of whom it is made. 13 Am. & Eng. Ency. of Law, page 314.

The distinction is made that words relating to the quality of articles made, produced, furnished, or sold, are not actionable without special damage, unless they go further and attack the individual. *Dooling* v. *Budget Publishing Co.* 144 Mass. 258.

And the same case holds that a reflection upon the plaintiff in the conduct of his business is actionable per se, because it is an attack upon the individual.

To say of a contractor "he used the old materials," when his contract was for new, is actionable. *Barboneau* v. *Farrell*, 15 C. B. 360.

In order to justify the defendant in the utterance of words otherwise slanderous, it is necessary that the facts proved by him should be co-extensive with the charge; and he can not protect himself from the consequences of having made it by showing that he believed it to be true, even if such belief was induced by misconduct or impropriety on the part of the plaintiff, which fell short of that which he had seen fit to impute. *Clark* v. *Brown*, 116 Mass. 504.

Reasonable ground for belief in the truth of the statements is not admissible in mitigation of damages. *Alderman* v. *French*, 1 Pick. 1; *Watson* v. *Moore*, 2 Cush. 133; *Parkhurst* v. *Ketchum*, 6 Allen, 406.

Hostility to partner in offense charged, let in to show malice. *Robbins* v. *Fletcher*, 101 Mass. 115.

The defendants in their answer set up the truth in regard to the manner in which plaintiffs were constructing the City Hall.

The building, at the time of the publication of the article in question, was only partially constructed; the tower was incomplete, and had been covered in for the winter; temporary layers of brick had been laid, in order that it might be covered in, with the intention that they should afterwards be taken down and replaced, as was subsequently done; and this was all apparent to any observer.

The defendants do not claim to have any positive knowledge of many of these allegations, and in fact, a large proportion of them were not known even by reputation until after the publication of the article; so these, at least, did not enter into the mind of Mr. Bass when he wrote it.

At the conclusion of the trial, on the motion of the plaintiffs, the jury were permitted to go to Bangor and personally inspect the building with reference to each of the defendants' allegations. They saw the building in its entirety and in all of its parts.

It is not claimed that the building was a perfect one. In fact, no such building ever is. It was not an expensive building. But we make bold to say that it was the best building for the money that was ever built in New England. Some members of the court have seen it and know of their own knowledge that what we are saying is true.

The plans and specifications did not call for the highest quality of work, either in labor or materials. That could not be expected for the money.

*F. H. Appleton and H. R. Chaplin, Seth M. Carter*, with them, for defendants.

Counsel argued : First : That the words set out in the declaration are not actionable and constitute no libel upon the plaintiffs in the way of their trade, business or occupation as contractors, as alleged.

Second : That the last allegation does not refer to them, and that the rest of the article is only fair and reasonable comment and criticism upon a public work made to the public by interested citizens and tax-payers.

The plaintiffs by their form of pleading, concede that the words about the Tweed ring are not defamatory of them on their face, and they bring in by way of inducement, extrinsic facts, which coupled with the language published, renders it, as they claim, actionable. They say by way of inducement that the words "the doings of the old Tweed ring" mean and refer to a gang of corrupt public officers of New York city who wickedly and corruptly conspired with certain contractors, who had contracted to build public works, to divide with them the proceeds of their contract and that the words, "were no worse than much that has been done in connection with our city building," they say, by their innuendo, mean and insinuate that the plaintiffs

had corruptly conspired with the agents and servants of the city of Bangor with reference to said contracts and to divide the proceeds thereof."

For the purpose of its construction, language is to be regarded not merely in reference to the words employed, but according to the sense of meaning which, all the circumstances of its publication considered, the language may be fairly presumed to have conveyed to those to whom it was published. Townsend, § 133.

The plaintiffs' whole scheme of defamation depends upon the alleged charge of conspiracy between the agents or servants of the city of Bangor and themselves, in pursuance of which, they were to corruptly divide with said agents or servants the proceeds arising from their contract to build the City Hall. This is the intrepretation they choose to put by their innuendo upon the language used, and they must abide by it. Newell, p. 629; Townsend, § 338, and cases cited; Odgers, 102.

Now there is no suggestion of the charge of conspiracy to be found anywhere in the published article. It protests against bossism, and the manner in which the contract for building the City Hall was awarded, charging that the local contractors were not fairly treated, this is the bone and marrow of the article — but it nowhere charges any conspiracy, either to divide the proceeds of the contract, or anything else, nor attributes this bad treatment of the local contractors to these plaintiffs directly or indirectly — on the contrary, it excludes the plaintiffs from even the inference of such an imputation by charging the whole matter upon the mayor who was then a candidate for re-election. The article is headed "Local Contractors Not Considered." The other portions of the article the plaintiffs do not pretend are libelous; and they constitute, with one exception, with what is included in the writ, the whole article.

The interpretation of the plaintiffs is contrary to the whole spirit of the publication, and perverts the idea which its language palpably conveys. It contains no insinuation of fraud, or criminal intent, or moral turpitude on the part of the plaintiffs. It does arraign Mr. Beal — it charges him with bossism

— with a contemptuous indifference to public opinion and the
rights of the public — with an arrogant assumption of power
and control over the disposition of submitted bids — it censures
his methods, it calls him a king boss and makes him responsi-
ble for the alleged unfair treatment of the local contractors. It
compares these acts of his, with the doings of the Tweed ring.
It does not pretend they are the same ; it does not say they are
the same. It says, that the doings of the old Tweed ring were
no worse than much that has been done in connection with our
city building.

In, this case the plaintiffs' innuendo puts upon the words used
a charge of criminal conspiracy, treating the language as a posi-
tive assertion of a thing instead of a comparison. But slander-
ous words uttered in a conditional or hypothetical statement
will not support an averment of slanderous words laid as a
direct or positive assertion. *Evarts* v. *Smith*, 19 Mich. 55 ;
*Randall* v. *Eve. News Assoc.* 101 Mich. 561.

If there can be any doubt that the alleged imputation is made
against Mr. Beal and not against these plaintiffs, all uncertainty
is removed by the sentence which immediately follows : " It is
in the hands of a wrecker, and how long will the tax-payers of
Bangor allow the present state of affairs to exist ?" Not in the
hands of wreckers as argued to the jury. The court will par-
ticularly note that Mr. Bass used the word "wrecker" in its
singular sense, meaning Mr. Beal; but if he had intended to
include in the expression, the "Tweed ring" with Beal, the
plaintiffs as contractors also, he would have used the plural
number, and this is in consistency with the whole spirit of the
article. And that the words the "Tweed ring" were used in a
collective sense to emphasize and reflect the spirit of bossism,
so offensively exhibited in the person of Mr. Beal, and with no
reference whatever to these plaintiffs, either as individuals or
as contractors, is further evidenced by the expression : "How
long will the tax payers of Bangor allow the present state of
affairs to exist ?" The article is written to the tax-payers of
Bangor — an election is pending — Beal is a candidate — an
appeal is made to them to destroy bossism and prevent his fur-

ther abuse of power and his further continuance in public office. This could only be done by defeating Mr. Beal at the polls in the coming election, and the tax-payers of Bangor could not prevent the present state of affairs from existing, except by electing another mayor and ex-officio chairman of the building committee in his stead.

Instructions: The court, in effect, says that Mr. Bass' defense is not complete unless he satisfied the jury what he claims in his brief statement, to wit, that the publication complained of was made without malice, is true, etc. Upon whom is the burden to satisfy the jury of the existence of actual malice? The authorities are unanimous that this burden is upon the plaintiffs; but the court in its instruction reverses the order of things and shifts the burden and says, in essence and effect, that Mr. Bass' defense is not complete unless, among other things, he satisfied the jury that the publication complained of was made without malice. Supposing the jury were not satisfied upon the evidence that the publication complained of was made with malice, then what? Why, it follows on the language of this instruction that the defendants' defense is not complete, unless they satisfy the jury that the publication complained of was made without malice. And we submit, that the language of this instruction is fairly susceptible of no other meaning, and that it could have conveyed no other meaning to the jury than that the defense was not made out, unless the defendants satisfy the jury that the publication was without malice. We submit, that this instruction was equivalent to saying, and in effect did say, to the jury that the burden of proof upon the question of malice rested upon the defendants. That is, that the burden of disproving malice rested upon the defendants rather than that the burden of proving malice rested upon these plaintiffs. If this is so, and to our minds, there is no escape from this conclusion, then it follows that this instruction was manifestly wrong.

The court will observe that there is no instruction to the jury, that the burden of proving that it was a malicious publication rested on the plaintiffs.

The charge squarely says that malice on the part of defendant

towards Beal would be, in contemplation of law, the same as malice towards the plaintiffs. The exact language of the instruction is as follows : "If on the other hand, it was published from spite as is claimed by the plaintiffs, although he had no direct ill will toward them, yet if you are satisfied that it did implicate them recklessly, and that in carrying out his ill will toward Mr. Beal, he made these charges against the plaintiffs as well as against Beal in order to implicate Beal, his malice toward Beal would be in contemplation of law, the same as malice toward the plaintiffs. If these charges were knowingly false, and he [meaning Bass] had no good reason for believing them true, they were not made in good faith and though the charge was made at Mr. Beal more especially on account of his ill will toward Beal, then the fact that he had no ill will toward the plaintiffs is no defense."

This proposition of law, that the plaintiffs can destroy the privilege arising from the occasion by proof of malice on the part of the defendants toward any person or persons other than themselves, is entirely unsupported by the authorities. After a careful and exhaustive examination, we have been unable to find a single case which expresses the doctrine laid down in the charge ; and we think it is safe to say that, if an isolated case could be found, sustaining the rule laid down by the presiding judge, still the weight of authority is overwhelmingly the other way.

Malice must be personal between the parties, and none others : Odgers, pp. 269-70 ; Townsend, p. 297 ; *Howard* v. *Sexton*, 4 Comst. 157 ; *Haley* v. *State*, 63 Ala. 89 ; *Stowell* v. *Beagle*, 57 Ill. 97 ; *Bacon* v. *Mich. C. R. R. Co.* 55 Mich. 224 ; Newell, p. 323 ; *Robertson* v. *Wylde*, 2 Moo. & Rob. 101 ; *Clark* v. *Newsam*, 1 Exc. 131-139 ; *Carmichæl* v. *Waterford, etc.*, 13 Ir. L. R. 313 ; *York* v. *Pease*, 2 Gray, 282.

Malice : *Hankinson* v. *Bilby*, 16 M. & W. 442 ; 18 How. Prac. Rep. 550 ; *People* v. *Freer*, 1 Caines, 485 ; *Root* v. *King*, 7 Cow. 633 ; *Bromage* v. *Prosser*, 4 B. & Cr. 247 ; *Huson* v. *Dale*, 19 Mich. p. 35 ; *Wilson* v. *Noonan*, 35 Wis. 321 ; *Lewis* v. *Chapman*, 16 N. Y. 372 ; *N. R. R. Co.* v. *Miller*, 10 Barb. 260 ; *Mahan* v. *Brown*, 13 Wend. 261 ; *South*

*Royalton Bank* v. *Suffolk Bank*, 27 Vt. 505; *Benjamin* v. *Wheeler*, 8 Gray, 409; *Manby* v. *Witt*, 18 C. B. 544; *Fahr* v. *Hayes*, 50 N. J. 275; Townsend, (4th Ed.) §§ 90 and 91.

Under our interpretation of the word "malice," we say that the jury should have been instructed that the defendants were entitled to a verdict unless the plaintiff proved that the article was untrue to the knowledge of Mr. Bass, or unless plaintiff proved that Mr. Bass did not believe the article to be true, or unless he made the statement therein recklessly.

SITTING: PETERS, C. J., FOSTER, HASKELL, WISWELL, STROUT, JJ.

FOSTER, J. This is an action of libel brought by the plaintiffs for the recovery of damages for defamation of themselves in their business, as contractors, against the defendants as proprietors of the Bangor Daily Commercial, by means of an article published in that paper, on March 28, 1894.

A verdict of $1508.03 was found for the plaintiffs, and the case comes before this court upon motion and exceptions by the defendants.

The publication of the alleged libel was during the progress of a municipal campaign in Bangor in which the election of F. O. Beal for mayor was then pending. The plaintiffs had contracted to build the Bangor City Hall, a public building designed to be used and occupied by the government of the city for public purposes, estimated to cost one hundred thousand dollars, but ultimately costing considerable more than that amount. The mason work had been suspended during the cold weather, and at the time of the publication of the alleged libel, the building, although in the process of construction, was in an incomplete and unfinished condition. The character of the construction of such a building was a matter of public importance and of interest to the inhabitants and tax-payers of Bangor and was, therefore, a matter of legitimate public discussion by the defendants as well as all others who had, in common with the rest of the community, a public and a private pecuniary interest in this important public work.

While the construction of this building was in progress, and while an election for mayor was pending, who was to be ex officio chairman of the building committee, an article was published by the defendants in their paper, and that portion of which claimed to be libelous, is as follows :

"The mason work is of the poorest quality and it should not be accepted by the city. Too much sand has been used in the mortar, and to such an extent that it does not prevent the alkali, which is the life of the mortar, from running out, as can be seen by the white appearance of the building. Very many of the bricks are loose, the mortar being too lifeless to hold them together, and the contractors should be obliged to take down and replace the imperfect sections of the walls.

"The doings of the old Tweed ring in New York, were no worse than much that has been done in connection with our city building."

The defendants contend that these words are not actionable and constitute no libel upon the plaintiffs in the way of their trade, business or occupation as contractors as alleged ; and, moreover, that the last allegation does not refer to them ; and that the article as a whole is only fair and reasonable comment and criticism upon a public work made to the public by interested citizens and tax-payers.

Two things are necessary for the maintenance of this defense. First, that the comment or criticism upon the plaintiffs' work should be fair and reasonable : Second, that it should be without malice toward them individually or in their business as contractors.

The question is, therefore, whether the the language used imports any personal reflection or attack upon the character of these plaintiffs, either as individuals or in their business as contractors, or whether it is merely a disparagement of the work done by them.

Every one has a right to comment on matters of public interest and concern, provided he does so fairly and with an honest purpose. Such comments or criticisms are not libelous, however severe in their terms, unless they are written maliciously. Thus

it has been held that books, prints, pictures and statuary publicly exhibited, and the architecture of public buildings, are all the legitimate subjects of newspaper criticism, and such criticism, fairly and honestly made, is not libelous, however strong the terms of censure may be, without the averment and proof of special damage, unless it goes further and attacks the individual. *Dooling* v. *Budget Publishing Co.* 144 Mass. 258; *Gott* v. *Pulsifer*, 122 Mass. 235; *Tobias* v. *Harland*, 4 Wend. 537; *Western Counties Manure Co.* v. *Lawes Chemical Manure Co.* L. R. 9 Ex. 218; *Merivale* v. *Carson*, 20 Q. B. Div. 275.

In *Crane* v. *Waters*, 10 Fed. Rep. 619, it was held that the safety of a bridge on the line of a railroad was matter in which the public were concerned; and that a newspaper might discuss the construction of the bridge, even though the effect of such discussion and criticism was, to some extent, a reflection upon the character of the builder.

So, too, upon the same principle, it has been held to be within the proper limits of criticism to publish of a newspaper that it is the most vulgar, ignorant and scurrilous journal ever published in Great Britain; for this affected the character of the newspaper only, and not, except remotely, the character or reputation of the person publishing it. *Heriot* v. *Stuart*, 1 Esp. 437.

The cases are numerous where this principle has been applied, and the doctrine upon which they are founded is one of universal application, that the public convenience is to be preferred to private interests, and that every man has a right to discuss freely, so long as he does it honestly and without malice, any subject in which the public are generally interested, and to state his own views for the consideration of all or any of those who have a common interest in the subject. *Henwood* v. *Harrison*, L. R. 7 C. P. 606, 621, 622.

Applying this rule to the case at bar, we think the language complained of is but a fair and reasonable criticism upon the work which entered into the construction of this public building. The mason work is criticised as being of the poorest quality, and ought not to be accepted by the city. The mortar

is criticised as containing too much sand. Criticism is also
made that very many of the bricks are loose, the mortar being
too lifeless to hold then together, and that the imperfect sections
of the wall should be taken down by the contractors. No attack is
made upon the character of these plaintiffs, either as individuals
or in their business as contractors. The criticism is not of
them, but of the work done by them.

But the plaintiffs contend that these assertions charge the
plaintiffs with not doing the work according to contract, and
that, therefore, the words become defamatory of the plaintiffs in
their business. If this be true, then it must follow, as a legal
conclusion, that no criticism however fair and reasonable could
ever be made upon the work which entered into the construction
of any public building, built under contract. To say that an
individual, or the public press, should be dumb upon a matter
which is of public interest, on the ground that any criticism
would impute a breach of contract, and consequently affect the
business of the contractors, would amount to an abrogation of
that rule of law to which we have referred; and deprive the
public of the right of criticism altogether, and that too, in
reference to matters in which individuals, cititizens and tax-
payers have a common interest.

Certainly, such comment or criticism would seem to be fair
and reasonable when temperately written and applied to a state
of facts such as this case develops, — for a full report of the evi-
dence in relation to the construction of the building is before
us, — and where the language of the criticism does not go be-
yond the work and attack the person.

It is sometimes said that fair and honest criticism in matters
of public concern is privileged. But this is not true in a strict
legal sense. The distinction between fair and reasonable com-
ment and criticism, and privileged communications, is this.
That in the latter case, the words may be defamatory but the
defamation is excused or justified by reason of the occasion;
while in the former case, the words are not defamatory of the
plaintiff, and hence not libelous,— the stricture or criticism is
not upon the person himself, but upon his work. So long,

therefore, as the criticism is confined to his work and does not attack the moral character or professional integrity of the individual, and is fair and reasonable, there is no libel because there is no defamation of the man himself. But, when the comment or criticism of the man's work becomes an attack on his private or business character, then the element of malice comes in and stamps the language as libelous. *Fraser* v. *Berkeley*, 7 C. & P. 621.

In this case, it is conceded that the defendants bore no malice whatever toward these plaintiffs, the evidence being that they were not acquainted with each other and never had either social or business relations. If, therefore, the defendants' criticism of the plaintiffs' work was fair and reasonable, and had no reference to their private or business character, and there was no proof of actual malice on the part of the defendants towards the plaintiffs, then, however much malice may have existed between the defendants and Mr. Beal, cannot make the defendants' criticism libelous. If the criticism of the defendants was fair and reasonable and in reference to a matter of public concern, and the plaintiffs are not attacked either in their private or business reputation, then it constitutes no libel because not defamatory ; and it cannot be made libelous by any attack upon the private or business reputation of some person other than the plaintiffs, no matter to what extent such malice may exist. Odgers on Libel, 39, 268. Newell on Libel, 324.

Moreover, we are of opinion that the alleged libel was a privileged communication. The principle applicable to cases in which the claim of privilege is set up is well settled. The difficulty more frequently lies in its application.

In general, an action lies for the publication of statements which are false and injurious to the character of another, for the reputation and character of individuals should not be wantonly and unnecessarily assailed. And the law considers such publication as malicious, unless it is fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs where his interest is

concerned. In regard to matters of public interest, all that is necessary to render the words spoken or published privileged is, that they should be communicated in good faith, without malice, to those who have an interest in the subject matter to which they refer, and in an honest belief that the communication is true, such belief being founded on reasonable and probable grounds. In such cases, the occasion rebuts the inference of malice, which the law would otherwise draw from unauthorized communications, and affords a qualified defense depending upon the absence of actual malice. If fairly warranted by any such occasion or exigency as we have named, and honestly made, upon reasonable and probable grounds, such communications are protected for the common protection and welfare of society.

Upon a careful consideration of the circumstances attending the publication of the article in question, as disclosed from the evidence offered at the trial, we feel warranted in the conclusion that the occasion was one that rendered the publication justifiable and privileged. The defendants were citizens, tax-payers and publishers of a newspaper in Bangor. The city building was then in process of construction. It had not been accepted by the city. There was indubitable evidence that the mason work was of poor quality and not in conformity to the contract; that the mortar used in the construction of certain parts of the building and the foundation walls was poor and lifeless and in many instances the bricks were loose, on account of the inferior quality of the mortar.

The building was of a public nature in which not only the defendants but every citizen of Bangor was interested. It was a legitimate subject of criticism by those interested in its construction.

The people· have a right to know how their municipal affairs are being conducted; how the money which they have contributed by way of taxes is being expended; and they have a right to know how the duties of those whom they have entrusted with the expenditure of such money are being performed, and it is one of the privileges of newspapers to give the people this information; and if the information so given is true, or if the

publishers act in good faith, without malice, believing it to be true, and have reasonable and probable cause for so believing, the law protects them. *Gott* v. *Pulsifer*, 122 Mass. 235.

When the matter complained of is privileged, the burden of proving malice lies on the plaintiff, and the defendant cannot be called on to prove that he was not actuated by malice until some evidence of malice more than a mere scintilla has been adduced by the plaintiff.

In this case we are unable to discover any evidence of malice between the defendants and the plaintiffs. There is nothing upon which a verdict could legally be sustained, and if there is evidence of any malice, it relates to other parties than these plaintiffs.

In relation to that portion of the alleged libel wherein the "Tweed ring" is referred to, all that need be said is, that it is not susceptible of the meaning ascribed to it by the plaintiffs' innuendo.

By no fair construction of the article can these words be held to apply to the plaintiffs, or either of them. The whole trend of the article is in another direction. The plaintiffs are not spoken of; their names are not given, nor is there any reference to their occupation, directly or indirectly.

The rule is too well settled to need citation of authority, that an innuendo "is only explanatory of some matter already expressed; it serves to point out when there is precedent matter, but never for a new charge; it may apply to what is already expressed, but cannot add to, or enlarge, or change the sense of the previous words." 1 Ch. Pl. 407; 1 Wm. Saunders, 243 a n. 4; *Emery* v. *Prescott*, 54 Maine, 389.

It is the province of the court to determine in the first instance whether the language published is reasonably susceptible of the meaning ascribed to it by the plaintiffs' innuendo. If it is not susceptible of such meaning, and the language is not upon its face defamatory of the plaintiffs, then they have no ground of action in reference to that particular charge.

The construction to be put upon this particular part of the alleged libelous publication must be that which is consistent

with the whole article, that which follows as well as that which precedes. When viewed in this light, it will be found that it will not reasonably bear the meaning attributed to it by the innuendo. The plaintiffs' whole scheme of defamation, upon this point, depends upon the alleged charge of conspiracy between the agents or servants of the city of Bangor and themselves, in pursuance of which they were to corruptly divide with them the proceeds arising from their contract to build the city hall. This is the interpretation they place upon the language by their innuendo, and by it they are bound. *Williams* v. *Stott*, 1 Cr. & M. 675. But there is no suggestion of the charge of conspiracy to be found anywhere in the published article, either to divide the proceeds of the contract or anything else; nor does it attribute the ill treatment of the local contractors to these plaintiffs either directly or indirectly. On the contrary, it excludes the plaintiffs from such an imputation by charging the whole matter upon the mayor who was then a candidate for re-election.

The interpretation which the plaintiffs have seen fit to ascribe to it is contrary to the whole spirit of the publication, and perverts the idea which its language plainly conveys. It contains no insinuation of fraud, or criminal intent, or moral turpitude on the part of the plaintiffs. It does arraign the mayor, charging him with bossism, with a contemptuous indifference to public opinion and the rights of the public, with an arrogant assumption of power and control over the disposition of submitted bids, and censures his methods, calling him king boss and charging him as responsible for the alleged unfair treatment of the local contractors. It compares these acts of his with the doings of the Tweed ring.

It is the opinion of the court that the motion for a new trial should be sustained and a new trial granted.

*Motion sustained.*